UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL CURKENDALL,

                        Petitioner,

        v.

WILLIAM P. MAZZUCA,

                      Respondent.
_____

**REPORT
and
RECOMMENDATION**

**05-CV-688S(F)**

APPEARANCES:        MICHAEL CURKENDALL, *Pro Se*
                                01-B-0802
                                Mid-State Correctional Facility
                                Box 2500
                                Marcy, New York 13403

                                ANDREW M. CUOMO
                                Attorney General, State of New York
                                Attorney for Respondent
                                MICHELLE E. MAEROV
                                Assistant Attorney General, of Counsel
                                120 Broadway
                                New York, New York 10271

## JURISDICTION

Petitioner commenced this action on September 29, 2005, requesting habeas corpus relief under 28 U.S.C. § 2254.  On December 5, 2005, Honorable William M. Skretny referred the matter to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), for report and recommendation.

## BACKGROUND

On September 29, 2005, Petitioner, Michael Curkendall ("Petitioner" or "Curkendall"), proceeding *pro se*, filed a Petition (Doc. No. 1) ("Petition"), commencing

this action seeking habeas relief, challenging Petitioner's March 30, 2001 conviction by jury, in Chemung County Court, for Manslaughter in the Second Degree, in violation of New York Penal Law ("N.Y. Penal Law"), § 125.15(1), Vehicular Manslaughter in the Second Degree, in violation of N.Y. Penal Law § 125.12(1), two counts of Driving While Intoxicated, in violation of New York Vehicle and Traffic Law ("N.Y. Veh. & Traf. Law") § 1192(2), Leaving the Scene of an Accident without Reporting, in violation of N.Y. Veh. & Traf. Law § 600(2)(a), Assault in the Third Degree, in violation of N.Y. Penal Law § 120.00(2), and two counts of Reckless Endangerment in the Second Degree, in violation of N.Y. Penal Law § 120.20.  The convictions pertain to a motor vehicle accident on August 17, 2000 in Chemung County, in which Petitioner's vehicle struck a vehicle driven by one Jane Briggs ("Briggs"), causing serious injury to Briggs as well as to her two grandchildren who were passengers in Briggs's vehicle.  Briggs later died as a result of her injuries.

Petitioner was sentenced to concurrent, indeterminate terms of imprisonment of five to fifteen years for the manslaughter conviction, two and one-third to seven years for the vehicular manslaughter conviction, one and one-third to four years for the leaving the scene of an accident conviction, and one year determinate terms on each of the driving while intoxicated, assault and reckless endangerment convictions.  On November 4, 2004, Petitioner's convictions were unanimously affirmed  by the New York State Supreme Court Appellate Division, Third Department.  *People v. Curkendall*, 783 N.Y.S.2d 707 (App. Div. 3d Dep't 2004).  Leave to appeal to the New York Court of Appeals was denied on December 30, 2004.  *People v. Curkendall*, 824 N.E.2d 56 (N.Y. 2004).  In the instant Petition, Petitioner asserts four grounds for relief, arguing that his

convictions and sentences are unconstitutional based on (1) a lack of sufficient evidence to support each conviction in violation of the Fourteenth Amendment's Due Process Clause, Petition ¶ 12(A) ("First Ground"); (2) the trial court judge's failure to recuse himself, thereby denying Petitioner federal due process, Petition ¶ 12(B) ("Second Ground"); (3) denial of an impartial jury, also a due process violation, Petition ¶ 12(C) ("Third Ground"); and (4) ineffective assistance of trial counsel in violation of the Sixth Amendment, Petition ¶ 12(D) ("Fourth Ground").

On February 22, 2006, Respondent filed the Declaration of Assistant Attorney General Michelle Maerov in Opposition to Petitioner for a Writ of Habeas Corpus (Doc. No. 10) ("Response") opposing the Petition, attaching exhibits A through J ("Respondent's Exh(s). __"), and Respondent's Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus ("Respondent's Memorandum").  On February 27, 2006, Respondent also submitted 12 volumes of state court records pertaining to Petitioner's conviction, including two volumes of transcripts of jury selection and 10 volumes of trial transcripts.

On May 18, 2006, Petitioner filed a Reply (Doc. No. 13) ("Reply") in further support of the Petition.  Oral argument was deemed unnecessary.

Based on the following, the Petition should be DISMISSED.

## FACTS[1]

At noon on August 17, 2000, Petitioner, then employed as a union electrician and

---

[1] Taken from the Petition, Response, Memorandum, exhibits and state court records filed in this action.

assigned to a job at St. Joseph's Hospital ("the hospital") in Elmira, New York ("Elmira"), went to lunch at the Hi Bar in Elmira, where Petitioner consumed two 12-ounce bottles of beer before Charles Patten, business manager for Petitioner's union local, purchased a third bottle of beer, of which Petitioner consumed only a portion. (Tr.[2] at 1375, 1382-83, 1661-65). Petitioner returned to the hospital at 12:45 P.M., 15 minutes before his shift ended at 1:00 P.M., and left the hospital for the day at 1:20 P.M. (Tr. at 1666).

After work, Petitioner went to the bank and his local union hall where Petitioner spoke with Assistant Union Business Manager Keenan Eagen ("Eagen"). (Tr. at 1385, 1387, 1389, 1666-70). Eagen did not notice Petitioner acting in an unusual manner and did not detect the odor of any alcohol on Petitioner's breath. (Tr. at 1388, 1390). Shortly after 2:00 P.M., Petitioner entered Beefeater's Bar ("Beefeater's") located in the village of Horseheads, Chemung County, New York, north of Elmira, New York, where he played five games of Quick Draw lottery and consumed two 12-ounce bottles of beer before leaving the bar at 3:20 P.M., returning to his home at 3:30 P.M. (Tr. at 1668-72, 1676-78, 1729). After arriving home, Petitioner, at 3:40 P.M., drove his son Zachary Curkendall ("Zachary") to a 4:00 P.M. dental appointment, and then to football practice. (Tr. at 1681-86). After dropping Zachary off at football practice, Petitioner drove to the home of Gene Cafolla ("Cafolla") to deliver some photographs from a little league baseball tournament Petitioner had attended on Long Island the previous week. (Tr. at 1571, 1591-92, 1690-91). Arriving at Cafolla's home at 4:40 P.M., Petitioner spoke with Kimberly Pesesky ("Pesesky"). (Tr. at 1391-1406, 1690-91). Pesesky did not smell any

---

[2] References to "Tr. at __" are to the specific page number of the trial transcript contained in Volumes 3 through 12 of the state court records.

alcohol on Petitioner's breath.  (Tr. at 1402).  After leaving Cafolla's home, Petitioner

drove to a nearby grocery store intending to purchase milk and bread, but the grocery

store was crowded so Petitioner instead cashed a check for $ 40 at the store's customer

service counter.  (Tr. at 1512, 1692-93).  Upon leaving the grocery store at 4:50 P.M.,

Petitioner decided to return to Beefeater's to play Quick Draw again. (Tr. at 1696).

Petitioner returned to Beefeater's at 5:00 P.M., where he met up with Roger Walton

("Walton") and Mark Stansfield ("Stansfield"), and proceeded to play Quick Draw and

consumed two beers, and a "shot" of Black Haus.[3]  (Tr. at 1696-1704, 1729-30).  Either

Petitioner or Stansfield had purchased the Black Haus shot Petitioner consumed.  (Tr.

at 1729-30).  Petitioner left the bar shortly after 6:00 P.M., (Tr. at 1705, 1733), declining

Walton's offer to have Walton's wife drive Petitioner home.  (Tr. at 772-73, 783-84).  In

total, Petitioner consumed six beers and the shot of Black Haus on August 17, 2000.

(Tr. at 1729).

Petitioner was driving home in his vehicle, a pickup truck, traveling north on East

Franklin Street in Horseheads, when Petitioner's vehicle collided with a minivan

traveling along East Franklin Street in the opposite direction.  (Tr. at 1743).  As a result

of the collision, the minivan's driver, Jane Briggs ("Briggs"), sustained multiple life-

threatening injuries and Briggs's two grandchildren, who were passengers in the

minivan at the time of the accident, also sustained injuries, albeit less serious than

Briggs.  Petitioner, who sustained less serious injuries, including cuts and abrasions on

---

[3] Black Haus is a German blackberry schnapps that is 80 proof, or 40% ABV (alcohol by volume).
Black Haus ® blackberry schnapps, *available at* http://www.drinksmixer.com/desc224.html (June 27,
2008).  Although the record does not indicate the exact amount of beverage contained in the "shot," the
court takes judicial notice that a "shot" of liquor typically refers to at least one ounce of the particular
beverage.

his arms and face, heard crying and screaming from the minivan, but, feeling sick and dizzy, walked away from the scene of the accident and into a nearby field, intending to get sick.  (Tr. at 1713, 1744).

The accident was witnessed by Karen Hable ("Hable"), who had been driving  her vehicle directly behind Petitioner on East Franklin Street, and had observed Petitioner's vehicle swerving, and several times crossing the center line of the two-way street into the oncoming traffic lane.  (Tr. at 380-85).  Hable slowed down her own vehicle to allow for some distance between her vehicle and Petitioner's vehicle.  (Tr. at 381).  Hable observed Petitioner's vehicle narrowly miss a white vehicle traveling in the opposite direction before striking the next oncoming vehicle, which was Briggs's minivan.  (Tr. at 385-86).  Immediately after the collision between Petitioner's and Briggs's vehicles, Hable placed a cellular telephone call to 911 to obtain emergency assistance.  (Tr. at 387-88).  Because Hable heard children screaming from inside the minivan, Hable approached Briggs's vehicle and observed a little girl sitting in the front passenger seat, no one in the driver's seat, a little boy in the back seat, and the driver lying on the vehicle's back floor moaning.  (Tr. at 388-89).  Hable observed the little girl appeared to be "in shock" and just sat in the front seat staring, but the little boy "had a pretty good goose bump on his forehead.  And when he turned his head, it looked like he had a little bit of blood on the back of his head."  (Tr. at 389).  Hable also noticed a man, whom she later identified as Petitioner, standing next to the other vehicle involved in the collision, who said nothing to Hable and did not approach Briggs's vehicle, but instead entered the field adjacent to the scene of the accident.  (Tr. at 390-91).

Shortly after the accident, another motorist, Arthur Clark ("Clark"), happened

6

upon the scene, stopped his vehicle and went to Briggs's vehicle, which was observed by Clark as having "very, very extensive damage."  (Tr. at 893-94).  Clark observed a female child in the front passenger seat strapped in by the seat belt with blood on her face, and a male child in a child restraint seat in the rear seat, but no one in the driver's seat, which Clark found "kind of shocking."  (Tr. at 894-95).  While the little girl appeared to be in shock, neither crying nor responding to Clark's questions but just staring at Clark, the little boy "was kind of hysterical," and was screaming.  (Tr. at 895).  Clark noticed the little boy "had a large lump on his forehead," the size of "half a golf ball" and "protruded out quite a ways."  (Tr. at 895-96).  As Clark looked past the boy, he noticed another person laying on the floor near the minivan's sliding door.  (Tr. at 896).

Among the first to arrive at the accident scene was volunteer firefighter and emergency medical technician ("EMT") Barbara Fudge ("Fudge"), who found no one in Petitioner's vehicle, and the driver's side of Briggs's minivan to be badly damaged.  (Tr. at 649-53).  Fudge observed that Briggs was lying on her back with her legs crossed up over her shoulders, complaining that she was unable to breathe, while Briggs's two grandchildren appeared to be in shock.  (Tr. at 654-56).  At 6:30 P.M., Chemung County Deputy Sheriff Peter Ruhmel ("Deputy Ruhmel"), arrived at the accident scene and observed Briggs lying on the floor in the back of the minivan with her legs over her head, and Petitioner's grandson was in a child restraint seat crying.  (Tr. at 261-62).  No one was inside Petitioner's vehicle.  (Tr. at 265, 360).

Various emergency personnel rendered emergency medical assistance to the minivan occupants, including Horseheads Town & Country Fire Department firemen Jeffrey Sweet, Jr. ("Sweet"), Shawn McInnerny ("McInnerny"), and John May ("May"), as

7

well as Erway Ambulance paramedic John Moretz ("Moretz").  (Tr. at 668-69, 788-90, 856-57).  The emergency personnel determined Briggs was seriously injured, having sustained an open left thigh fracture and a closed right thigh fracture, an open fracture to her left arm, complex fractures of the pelvic bones, and complex lacerations through Briggs's left ear and left lower leg.  (Tr. at 862-65, 867).  Although Briggs was conscious, her legs were badly deformed by the fractures and were bent over her head almost to her shoulders.  (Tr. at 263).  Briggs's legs were so badly deformed that McInnerny at first thought she was a paraplegic.  (Tr. at 794).

Briggs continued to cry out in pain as the emergency personnel straightened her legs to allow Briggs to be placed onto a backboard and loaded into the ambulance.  (Tr. at 863).  Briggs's two grandchildren, who had been passengers in the minivan, were upset and crying; her three year-old grandson sustained a golf ball-sized hematoma or "goose egg" to his forehead, a cut to his jawbone and bruising under one eye, and her five year-old granddaughter suffered a smaller hematoma and cut to her forehead.  (Tr. at 77, 80-82, 93-94, 860-61).  McInnerny described the boy's injury as "a very large knot" located on his forehead, "the size of about a half a baseball almost."  (Tr. at 794-95).  McInnerny also recalled the boy was crying and screaming.  (Tr. at 795).  Moretz described the boy's injury as "a large hematoma, goose egg type, in the frontal area of his forehead."  (Tr. at 861).  All three minivan occupants were removed from the scene of the accident by ambulance to the emergency room at Arnot Ogden Hospital in Elmira.  (Tr. at 863, 865).

Meanwhile, a bystander informed Deputy Ruhmel that the driver of Petitioner's vehicle had fled into the woods.  (Tr. at 266, 313-14, 319, 328).  Chemung County

Sheriff Deputy Thomas Argetsinger ("Deputy Argetsinger") headed into a field adjacent to the accident scene searching for Petitioner.  (Tr. at 270-71, 304-05, 311-12, 318, 338, 471).  After walking approximately 60 yards into the field, Deputy Argetsinger saw Petitioner crouching down on one knee beside a barn located behind a residence facing East Franklin Street.  (Tr. at 472).  Deputy Argetsinger made eye contact with Petitioner, ordered Petitioner to stop and identified himself as a Deputy Sheriff.  (Tr. at 473-74). Petitioner, however, responded by running away from Deputy Argetsinger but fell after a few steps.  (Tr. at 474).  Deputy Argetsinger ran to where Petitioner lay on his back on the ground, ordered Petitioner to raise his hands and handcuffed Petitioner.  (Tr. at 476).

Deputy Ruhmel joined Deputy Argetsinger in the field and Petitioner was asked to stand and put up his hands.  (Tr. at 270).  Petitioner managed to raised himself up on one knee before falling over, and the two deputies then helped Petitioner to his feet. (Tr. at 271, 336, 477).  Several times the deputies asked Petitioner his name, which Petitioner refused to provide.  (Tr. at 273-74, 477-78).  Both deputies observed Petitioner's eyes to be bloodshot and watery, and also detected a strong odor of alcohol emanating from Petitioner's breath.  (Tr. at 272-74, 478).  Because Petitioner was extremely unsteady on his feet, the deputies had to assist Petitioner in walking out of the field by supporting Petitioner on either side.  (Tr. at 271, 318, 321-22, 478-79). Petitioner did, however, ask the deputies, in slurred speech, whether "they [the victims in Briggs's vehicle] were okay,"  stated he was "so embarrassed," and asked if he could "just leave."  (Tr. at 275, 359).  Petitioner was brought by the deputies to a waiting sheriff's patrol vehicle where emergency medical personnel examined Petitioner's

injuries and bandaged his bleeding elbow.  (Tr. at 277-78).  Petitioner refused an offer

for further medical treatment.  (Tr. at 278, 320).

Petitioner's injuries were examined by firemen Sweet and McInnerny who

determined Petitioner had sustained lacerations to his left arm, left cheek, and a slight

laceration to the head, and also detected a strong odor of alcohol from Petitioner.  (Tr.

at 677-80, 796-801).  Petitioner continued to refuse to provide the firemen with his

identity, stating only that he was "embarrassed," had "really fucked up," and that he was

"going away for a long time," but also asked "how are the other people?"  (Tr. at 801).

Petitioner refused the follow-up medical treatment the firemen offered. (Tr. at 801).

At 7:05 P.M., Deputies Ruhmel and Argetsinger administered to Petitioner a series

of field sobriety tests, including a walk-and-turn test, finger-to-nose test, and one-leg

stand test, with Petitioner failing to perform all three tests.  (Tr. at 278-82).  Based on

Petitioner's blood-eyes and inability to stand on his feet, along with the odor of alcohol

on Petitioner's breath, Deputy Ruhmel concluded that Petitioner was intoxicated. (Tr. at

284, 321).  At 7:14 P.M., Petitioner was placed under arrest and Miranda[4] and driving

while intoxicated warnings were administered. (Tr. at 285, 338).  Petitioner consented to

a chemical blood alcohol content ("BAC") test (Tr. at 287-88).  Petitioner then voluntarily

admitted to driving his truck after consuming six beers at Beefeaters.  (Tr. at 289-90,

352).

At 7:36 P.M., Petitioner was driven in the sheriff's patrol car to the Chemung

County Sheriff's Department, where Deputy Ruhmel again administered the field

_____

[4] *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), requires an accused person be advised of their
Fifth Amendment right against self-incrimination and Sixth Amendment right to counsel prior to
interrogation.

sobriety tests to Petitioner who, despite performing somewhat better than before, again failed all three tests, and the deputies observed Petitioner continued to be glassy-eyed with slurred speech and alcohol-scented breath.  (Tr. at 293-95, 339-47).  Petitioner's performance of the field sobriety tests at the Sheriff's Department was videotaped.  (Tr. at 291).  At 8:13 P.M., a breathalyzer examination was administered to Petitioner who, after breathing into the breathalyzer machine, registered a BAC, or blood alcohol content, of .21 %. (Tr. at 299, 1721).

Petitioner was taken to the Chemung County Jail where he remained until 1:00 A.M. on August 18, 2000, when several of Petitioner's relatives, including his father, brother, and oldest daughter, posted Petitioner's bail. (Tr. at 1548, 1560, 1575, 1721). Although Petitioner was still bleeding from the cut on his left arm, and portions of Petitioner's clothing were saturated with blood, Petitioner refused offers from his family to take him for medical treatment, insisting on being taken to his home. (Tr. at 1538, 1555-57, 1561, 1563-64, 1577).  En route to Petitioner's house, Petitioner's brother, in whose vehicle Petitioner was riding, stopped at a fast-food establishment where the party obtained napkins to soak up the blood dripping from Petitioner's left arm.  (Tr. at 1551, 1556, 1562, 1578).  When Petitioner's father and daughter asked Petitioner what happened, Petitioner responded, "most of it I don't remember."  (Tr. at 1562, 1577).

Upon returning home at 1:30 A.M. on August 18, 2000, Petitioner's wife, Theresa Curkendall ("Mrs. Curkendall"), who is a registered nurse, observed Petitioner had blood on his pants and his shirt was wet with blood from the armpit to the waist.  (Tr. at 1612, 1629-30).  Mrs. Curkendall cleaned a two-inch gash on Petitioner's left elbow, but Petitioner refused his wife's suggestion that she take Petitioner to the hospital for

stitches, but he refused.  (Tr. at 1615-16, 1630, 1723).  According to Mrs. Curkendall, Petitioner's forehead was pink and swollen and he appeared feverish, causing Mrs. Curkendall to suspect Petitioner had a concussion.  (Tr. at 1618, 1632).  Petitioner had a confused, dazed look in his eyes and was "acting funny" and, in response to Mrs. Curkendall's questions about the accident, stated, "I can't, I'm confused, I don't understand what's happened; I want to tell you what happened and I can't; I can't explain it, I can't tell you."  (Tr. at 1616, 1619).  Petitioner's head remained swollen and he was unable to recall the events leading up to the accident throughout the next day. (Tr. at 1623-24, 1724).

At 5:00 P.M. on August 18, 2000, Petitioner was arrested for leaving the scene of an accident.  (Tr. at 1624, 1724).  Petitioner was taken to the Chemung County Courthouse where bail was set, and Petitioner was taken into custody.  (Tr. at 1725). Petitioner never posted bail and remained in custody throughout his trial.  (Tr. at 1725).

Meanwhile, the three accident victims were taken to Arnot Ogden Hospital where the little boy, Noah, underwent a CAT scan of his head, an X-ray of his arm, his arm was bandaged and placed in a sling, the cut on his jaw was cleaned, and was prescribed Tylenol with codeine for pain.  (Tr. at 80-83, 90).  The little girl, Alexis, was treated for several small cuts and bruises to her face, had her head wrapped and released the night of August 17, 2000.  (Tr. at 76-77, 93-84).  Briggs, who had multiple fractures, arrived at the emergency room of Arnot Ogden Hospital, with low blood pressure and in shock.  (Tr. at 225-26, 248-49, 252).  Briggs was conscious, although incoherent and minimally responsive, complained of pain, and was given blood transfusions to restore her blood pressure and a breathing tube and breathing machine,

then transferred to the operating room where Edward Clarke, M.D. ("Dr. Clarke"), performed orthopaedic surgery on her fractures.  (Tr. at 229, 249, 255).  Although nothing in Briggs's medical records indicates the surgery, including debridement and sanitation of the wounds, was unsuccessful and Briggs initially stabilized and tolerated the surgery well, Dr. Clarke assessed Brigg's likelihood of survival at 50%.  (Tr. at 230, 246. 253).

Despite the surgical intervention provided to Briggs, five days after the accident, her vital signs began to deteriorate and her lungs, liver and kidney began to fail.  (Tr. at 231, 247).  Dr. Clarke diagnosed Briggs with Systemic Inflammatory Response Syndrome ("SIRS"), a condition in which the body is attacked by chemical molecules produced in response to injury.  (Tr. at 231-33, 235, 242-43).  On August 31, 2000, Briggs died of multiple organ system failure which Dr. Clarke attributed to the SIRS, but agreed it could have been caused by sepsis, another type of infection.  (Tr. at 231-33, 235, 242-43, 245).  Briggs's official cause of death was listed on her death certificate as sepsis and SIRS.  (Tr. at 237-38).  Briggs's daughter, Tina, who is the mother of Briggs's grandson Noah, spent 12 to 14 hours a day with Briggs throughout Briggs's hospitalization following the accident, but Briggs never recovered enough to communicate with her daughter.  (Tr. at 85-86).

At Dr. Clarke's request, pathologist Rana Samuel, M.D. ("Dr. Samuel"), performed an autopsy on Briggs, following which Dr. Samuel attributed the cause of Briggs's death to multiple system organ failure due to SIRS caused by injuries sustained in the August 17, 2000 accident.  (Tr. at 1350-57).

Chemung County Court Judge James T. Hayden ("Judge Hayden") presided

over Petitioner's two-week jury trial which commenced with jury selection on Tuesday,

January 16, 2001.  Petitioner was represented at arraignment through trial by Joseph

Joch, Esq.  During pretrial proceedings, Joch filed pre-trial motions on Petitioner's

behalf, including for the recusal of Judge Hayden who, 14 years earlier, had, as a

Chemung County Assistant District Attorney, prosecuted Petitioner on a drunk driving

charge, inspection of the grand jury minutes, and bail reduction.  The motions seeking

recusal and bail reduction were denied, whereas the motion for inspection of the grand

jury minutes was rendered moot after the District Attorney voluntarily provided the grand

jury minutes to Joch.  By letter dated November 20, 2000, Joch requested a *Sandoval*

hearing,[5] seeking to have the prosecution excluded from cross-examining Petitioner,

should he choose to testify, regarding certain prior arrests and convictions, including

1977 arrests for petit larceny, assault, resisting arrest, and obstructing governmental

administration, a 1978 conviction for disorderly conduct, a 1980 arrest for petit larceny,

and subsequent conviction for attempted petit larceny, a 1982 driving while intoxicated

conviction, and 1988 convictions for second degree vehicular assault and operation

while intoxicated.  Joch also requested each side be given 20 peremptory challenges

with five additional challenges, two hours for initial questioning of the venirepersons,

and one hour for subsequent panels.

Following the *Sandoval* hearing, conducted on January 5, 2001, Judge Hayden

agreed to exclude from evidence five prior arrests and convictions, including the 1977

---

[5]A *Sandoval* hearing is based on the New York State Court of Appeals' decision in *People v. Sandoval*, 314 N.E.2d 413 (N.Y. 1974), holding that a judge may determine what use the prosecution may make, at trial, of a defendant's prior convictions or proof of a prior commission of any specific criminal, vicious or immoral acts by a defendant to impeach the defendant's credibility, should he testify.

petit larceny conviction, 1978 assault arrest, 1980 petit larceny conviction, and the 1982 driving while intoxicated conviction.  Petitioner also consented to being questioned at trial regarding his 1988 vehicular assault and operating while intoxicated convictions. Judge Hayden denied the request for additional peremptory challenges and limited questioning of the venirepersons to one hour for the first panel and one-half hour for subsequent panels.

Testimony at the trial included contrasting reasons as to the precise cause of Briggs's death.  Specifically, whereas Dr. Samuel, testifying on behalf of the prosecution, attributed the cause of Briggs's death to multiple organ system failure attributed to SIRS caused by the injuries Briggs sustained in the accident (Tr. at 1355-37), John Shane, M.D. ("Dr. Shane"), testifying on Petitioner's behalf, attributed Briggs's death not to SIRS causes solely by injuries sustained in the accident but, rather, to pre-existing kidney and liver diseases, undiagnosed and untreated diabetes, and an infection acquired in the hospital.  (Tr. at 1802-1948).

There was also conflicting testimony regarding whether Petitioner's vehicle crossed the centerline of the road and crashed into Briggs's vehicle, or whether it was Briggs's vehicle that crossed the centerline, striking Petitioner's vehicle.  Specifically, Steven Milford, a captain in the Chemung County Sheriff's Department, Criminal Investigation Division ("CID") ("Deputy Milford"), witness for the prosecution, testified that Petitioner's vehicle, while traveling north on East Franklin Street, crossed the center-line into the southbound lane and struck Briggs's vehicle.  (Tr. at 96-222).  Hable, testifying for the prosecution, stated that the accident occurred near a blind curve in the road, and that a white vehicle traveling directly in front of Briggs's vehicle, in rounding

such curve, had driven close to the center line, causing Petitioner to swerve toward the right shoulder of Petitioner's lane, and then appeared to overcorrect by veering into the oncoming lane, avoiding the white vehicle, but colliding with Briggs's vehicle.  (Tr. at 384-86).  Defense witness Boyd Keith Workman ("Workman"), testifying as an accident reconstructionist, stated that gouge marks found at the scene of the accident showed the collision occurred near the center of the road, rather than in the middle of Briggs's lane.  (Tr. at 1451, 1467, 1470, 1489).  There was no evidence estimating the speed of either Petitioner's vehicle or the Briggs vehicle at the time of the crash.

Petitioner also presented testimony in an attempt to establish that he had a sleeping disorder that caused him to experience sleep loss, leaving him chronically overtired, and had sustained serious injuries during the accident, such that he left his vehicle and entered the adjacent field because he was dizzy and disoriented and believed he was about to vomit, and that Petitioner's inability to perform the field sobriety tests was more properly attributed to his exhaustion and a possible concussion. (Tr. at 1713).

The trial continued through Tuesday, January 30, 2001, when the jury found Petitioner guilty on all eight charges.  Petitioner was sentenced by Judge Hayden on March 30, 2001 to determinate terms of one year on the assault, driving while intoxicated (two counts) and reckless endangerment (two counts) convictions, and indeterminate sentences of one and one-third to four years for leaving the scene of an accident, two and one-third to seven years for vehicular manslaughter, and five to fifteen years for manslaughter, all sentences to run concurrently.

## DISCUSSION

### 1.   Jurisdiction

The relevant federal habeas statute vests the district courts with "jurisdiction to entertain petitions for habeas relief only from persons who are 'in custody in violation of the Constitution or laws or treaties of the United States.'" *Maleng v. Cook*, 490 U.S. 488, 490 (1989) (quoting 28 U.S.C. § 2241(c)(3)).   As such, when the habeas petition is filed, the Petitioner must be in custody with regard to the challenged conviction or sentence. *Id*. at 490-91.

Here, when the Petition was filed on September 29, 2005, Petitioner was no longer incarcerated on his convictions for second degree assault, second degree reckless endangerment (two counts), driving while intoxicated (two counts) and leaving the scene of an accident.   Specifically, when Petitioner was sentenced on March 30, 2001, he received concurrent sentences on all eight convictions, including one year for the assault, reckless endangerment and driving while intoxicated convictions, and an indeterminate sentence of one and one-third to four years for leaving the scene of an accident.   Accordingly, the assault, reckless endangerment and driving while intoxicated sentences all expired on March 30, 2002, whereas the sentence for leaving the scene of an accident expired no later than March 20, 2005.   Because these sentences expired prior to September 29, 2005, Petitioner was no longer in custody on those convictions when the Petition was filed, and the court is without jurisdiction to review such convictions.   *Maleng*, 490 U.S. at 490-91.

Because this matter is before the undersigned for report and recommendation, however, the merits of Petitioner's challenges to his convictions for assault, reckless

endangerment, driving while intoxicated, and leaving the scene of an accident are considered in the event the District Judge find there is jurisdiction to consider the claims with regard to such convictions, as well as with regard to the convictions for which Petitioner remained in custody when the Petition was filed.

**2.**     **Standard of Review**

In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, a district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution or any laws or treaties of the United States. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *reh'g denied*, 501 U.S. 1277 (1991). A state petitioner's federal habeas corpus petition may be dismissed if the petitioner has not exhausted available state remedies as to any of his federal claims, *Rose v. Lundy*, 455 U.S. 509 (1982), although under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court is permitted to deny a state prisoner's habeas corpus petition on the merits even though the prisoner has not exhausted available state remedies.  28 U.S.C. § 2254(b)(2).

In reviewing habeas petitions, federal courts do not function as appellate courts to review matters within the jurisdiction of the state, or to review specific rulings and decisions of state trial and appellate courts not involving federal constitutional issues; rather, the court determines whether the proceedings in the state court amount to a violation of federal constitutional rights. *Coleman*, 501 U.S. at 729.  Federal review of a state court conviction is limited to errors of federal constitutional magnitude which denied a criminal defendant the right to a fundamentally fair trial.  *Cupp v. Naughton*,

414 U.S. 141 (1973).  Pursuant to 28 U.S.C. § 2254(e), formerly 28 U.S.C. § 2254(d), the state court's determination as to evidentiary matters is presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record.  *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).  Otherwise, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous.  28 U.S.C. § 2254(e)(1).  Further, § 2254(e) applies, by its terms, "to factual determinations made by state courts, whether the court be a trial court or an appellate court."  *Sumner*, 449 U.S. at 547.

A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is not entitled to an evidentiary hearing by the federal court, but the granting of a hearing is within the discretion of the federal district court.  *Pagan v. Keane*, 984 F.2d 61, 63 (2d Cir. 1993); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 4-5 (1992)(citing *Townsend v. Sain*, 372 U.S. 293 (1963)).  The state court's determination is, however, presumed to be correct unless the federal habeas court concludes that the relevant state court determination is not fairly supported by the record.  *Sumner*, 449 U.S. at 539, 546-47.  Absent these factors, the burden rests on the petitioner to establish, by clear and convincing evidence, that the factual determination is erroneous.  *Id*.

In the instant case, the court is in possession of the complete state record, including the motion, hearings and trial transcripts as well as the briefs filed in connection with Petitioner's direct appeal to the Appellate Division and his motions for post conviction relief, including pursuant to N.Y. Crim. Proc. Law § 440.10, and writ of error *coram nobis*.  Petitioner has not requested that the court conduct an evidentiary hearing prior to resolving his claims for relief and has not challenged the record below

19

as inaccurate.  Accordingly, the court in its discretion finds an evidentiary hearing unnecessary.

Pursuant to 28 U.S.C. § 2254, as amended by AEDPA, a federal court must give substantial deference to a state court determination that has "adjudicated [the federal constitutional claim] *on the merits.*"  28 U.S.C. § 2254(d) (italics added); *Sellan v. Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).  Specifically, AEDPA requires that where a state court has adjudicated the merits of a petitioner's federal claim, habeas corpus relief may not be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("§ 2254(d)").

In *Williams v. Taylor*, 529 U.S. 362, 413 (2000), the Supreme Court interpreted the phrases, as used in § 2254(d), "contrary to" and "an unreasonable application of clearly established Federal law."  According to the Court, a state court decision is "contrary to clearly established Federal law," 28 U.S.C. § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  A state court decision involves "an unreasonable application" of Supreme Court caselaw if it "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case."  *Id.*  Both AEDPA, and its

20

predecessor statute, recognize that a presumption of correctness shall apply to state

court findings of fact.  *Whitaker v. Meachum*, 123 F.3d 714, 715 n. 1 (2d Cir.1997).

AEDPA also requires a petitioner to rebut that presumption by "clear and convincing

evidence."  28 U.S.C. § 2254(e)(1); *Lanfranco v. Murray*, 313 F.3d 112, 117 (2d Cir.

2002).  A presumption of correctness applies to findings by both state trial and appellate

courts.  *Galarza v. Keane, 252 F.3d 630, 635* (2d Cir. 2001); *Whitaker*, 123 F.3d at 715

n.1.

A federal habeas court must apply the § 2254(d) deferential review standard

where the state court has "adjudicated [the federal claim] on the merits."  28 U.S.C. §

2254(d).  If the claims have not been adjudicated on the merits, the federal court applies

the pre-AEDPA *de novo* review standard, even where the petition was filed after the

effective date of the statute.[6]   *See Sellan*, 261 F.3d at 314; *Boyette v. Lefevre*, 246 F.3d

76, 89, 91 (2d Cir. 2001).

A petitioner can most easily alert the state court to the constitutional nature of a

claim by directly citing to a specific constitutional provision and arguing that such

provision was violated.  *Davis v. Strack*, 270 F.3d 111, 122 (2d Cir. 2001) ("if a

petitioner cites to specific provision of the U.S. Constitution in his state court brief, the

petitioner has fairly presented his constitutional claim to the state court.").  In many

instances, however, whether a state court has adjudicated a federal constitutional

claims on its merits is not so clear.

---

[6] The AEDPA applies to petitions filed on or after the statute's April 24, 1996 effective date.  *See, e.g., Williams v. Taylor* , 529 U.S. 362, 402 (2000) (O'Connor, J., writing for the majority); *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000) (*per curiam*), *cert. denied*, 531 U.S. 840 (2000).  Thus, the AEDPA applies to the instant petition.

In *Sellan*, the Second Circuit held that a federal claim is adjudicated on the merits when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Sellan*, 261 F.3d at 312. In other words, in order to invoke the deferential review standards of § 2254(d)(1), "the state court need only dispose of the [p]etitioner's federal claims on substantive grounds, and reduce that disposition to judgment. No further articulation of its rationale or elucidation of its reasoning process is required." *Aparicio v. Artuz*, 269 F.3d 78, 93-94 (2d Cir. 2001), citing *Sellan*, 261 F.3d at 312. If there is no indication that the federal claim has been decided solely on state procedural grounds, the federal claim will be considered to have been adjudicated on the merits. *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002). Put another way, the failure to state specific reasons for a state court adjudication on federal claims raised on appeal does not avoid a finding that the state court determination was on the merits of each federal ground presented to the appellate court for purposes of applying AEDPA's deferential standards. *See*, *e.g.*, *Brown*, 283 F.3d at 498 ("[b]ecause there is no basis either in the history of the case or the opinion of the Appellate Division for believing that [petitioner's] Sixth Amendment claim was denied on procedural or any other nonsubstantive grounds, we find that his claim was 'adjudicat[ed] on the merits' by the state court, and therefore review his Sixth Amendment claim under the more deferential standard set forth in § 2254.") (citing *Sellan*, 261 F.3d at 314) (bracketed material added).

In the instant case, the record establishes that Petitioner exhausted three of his four grounds for habeas relief, including his First Ground challenging the legal sufficiency of the evidence, his Third Ground alleging denial of an impartial jury, and his

Fourth Ground alleging ineffective assistance of trial counsel.  In raising Judge

Hayden's failure to recuse himself as a ground for appeal, the Second Ground,

however, Petitioner failed to rely on federal law or to employ constitutional analysis;

rather, a review of the legal memoranda submitted on Petitioner's behalf in appealing

his conviction establish that Petitioner argues only that Judge Hayden's refusal to

recuse himself violated New York Judiciary Law § 14's prohibition against any judge

from sitting as a judge, or taking any part, "in the decision of an action, claim, matter,

motion or proceeding to which he is a party, or in which he has been attorney or

counsel, or in which he is interested . . . ."  N.Y. Jud. Law § 14 (McKinney 2001).

Significantly, neither  Petitioner, nor the cases on which he relied, support Petitioner's

argument that Judge Hayden's refusal to recuse himself deprived Petitioner of federal

due process in violation of the Fourteenth Amendment.  Moreover, none of the cases

cited by the Appellate Division in affirming Petitioner's conviction consider the failure of

a trial judge to recuse himself in terms of due process.  *See People v. Curkendall*, 783

N.Y.S.2d 707, 711 (App. Div. 3d Dep't 2004) (citing *People v. Jones*, 532 N.Y.S.2d 586

(App. Div. 3d Dep't 1988); *People v. Rosato*, 599 N.Y.S.2d 195 (App. Div. 4th Dep't

1993), *lv. denied*, 645 N.E.2d 1227 (N.Y. 1994); *People v. Jabaut*, 591 N.Y.S.2d 673

(App. Div. 4th Dep't 1993); and *People v. Tartaglia*, 324 N.E.2d 368 (N.Y. 1974)).  As

such, the record establishes that Petitioner has failed to exhaust his Second Ground for

habeas relief, challenging Judge Hayden's refusal to recuse himself.

Furthermore, Petitioner's failure to exhaust his Second Ground for relief has

rendered it procedurally defaulted because no other means of redress remain in state

court.  In particular, federal habeas review generally is unavailable for any claim that

23

has been procedurally defaulted in state court because, before a federal court may review a state prisoner's habeas petition, the prisoner must exhaust all available state court remedies.  28 U.S.C. § 2254(b)(1)(A); *see Picard v. Connor*, 404 U.S. 270, 275 (1971) (citing cases).  "The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts."  *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir.), *cert. denied*, 546 U.S. 889 (2005).  "A petitioner satisfies the fair presentation aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it."  *Cotto v. Herbert*, 331 F.3d 217, 237 (2d Cir. 2003) (citing *Ramirez v. Attorney Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir. 2001)).

Although the Second Circuit has recognized that "'a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution' so long as he relies 'on pertinent federal cases employing [the relevant] constitutional analysis' or alleges 'a pattern of facts' that clearly implicates a specific constitutional provision,"  *Cotto*, 331 F.3d at 237 (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982)), as discussed, Discussion, *supra*, at 22-23, in this case, Petitioner has not relied on such federal constitutional analysis nor alleged a pattern of facts clearly implicating any specific constitutional provision.  As such, Petitioner has procedurally defaulted and thus forfeited his right to challenge Judge Hayden's refusal to recuse himself as a ground for habeas relief based on the federal right to procedural due process.

Nevertheless, because this matter is before the undersigned for report and recommendation, the merits of Petitioner's Second Ground are considered should the

District Judge find the Second Ground was essentially presented on appeal to the state courts as a Fourteenth Amendment due process violation. Such claim is, however, subject to the pre-AEDPA standard *de novo* review. *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir. 2001) (federal habeas claim not adjudicated on the merits in state court is subject to pre-AEDPA standard *de novo* review).

### 3.  Timeliness of Petition

Review of federal habeas corpus petitions filed by state prisoners on or after April 24, 1996, is governed by the AEDPA, which provides a one-year statute of limitations for the filing of habeas petitions. 28 U.S.C. § 2244(d)(1). The limitations period, where petitioner is in custody pursuant to the judgment of a state court, runs from the latest of four dates. 28 U.S.C. § 2244 (d)(1)(A-D). The one-year period of limitations is tolled for periods of time during which a properly filed application for state post-conviction relief is pending, although the limitations period is not tolled during the pendency of a petition for *certiorari* to the Supreme Court seeking review of the denial of state post-conviction relief. 28 U.S.C.§ 2244(d)(2); *Lawrence v. Florida*, __ U.S. __, 127 S.Ct. 1079, 1082-83 (2007); *Bennett v. Artuz*, 199 F.3d 116, 118-19 (2d Cir. 1999).

In the instant case, the applicable date is "the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Specifically, Petitioner's conviction became final on March 29, 2005, 90 days after the New York Court of Appeals denied Petitioner's request for leave to appeal on December 30, 2004, during which Petitioner could have sought further direct review by filing a petition for a writ of certiorari with the United

States Supreme Court.  *Lawrence*, 127 S.Ct. at 1083.  As such, the Petition, filed

September 29, 2005, was filed within AEDPA's one-year filing period, and thus is timely.


**4.     Merits of Claims**

As stated, Petitioner asserts four grounds for habeas relief, including (1) a lack of

sufficient evidence to support each conviction, Petition ¶ 12(A) ("First Ground"); (2) the

trial court judge's failure to recuse himself, Petition ¶ 12(B) ("Second Ground"); (3)

denial of an impartial jury, Petition ¶ 12(C) ("Third Ground"); and (4) ineffective

assistance of trial counsel, Petition ¶ 12(D) ("Fourth Ground").  The court addresses the

merits of each of these grounds in turn.


**A.     First Ground - Sufficiency of the Evidence**

Petitioner challenges his convictions for second degree manslaughter, second

degree vehicular manslaughter, leaving the scene of an accident, third degree assault,

second degree reckless endangerment (two counts), and driving while intoxicated (two

counts) as not supported by legally sufficient evidence presented at trial.[7]  Petition ¶

12(A) at 5, 5-A1 - 5-A8.  Respondent maintains that Petitioner is actually challenging his

convictions as against the weight of the trial evidence, which essentially attacks the

jury's credibility findings, rather challenging than the legal sufficiency of the evidence,

---

[7] Although Petitioner lists all eight convictions as unsupported by legally sufficient evidence, the Petition does not include any argument with regard to the driving while intoxicated convictions.  *See* Petition ¶ 12(A) at 5-A2.

which cannot support habeas relief.[8]   Respondent's Memorandum at 19-30.

"A habeas petitioner challenging the sufficiency of the evidence supporting his conviction bears a heavy burden."  *Knapp v. Leonardo*, 46 F.3d 170, 178 (2d Cir.), *cert. denied*, 115 S.Ct. 2566 (1995).  The standard to be applied in a federal habeas corpus petition when the claim is made that the petitioner has been convicted in state court on insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In considering the sufficiency of the evidence on a habeas petition attacking a conviction, the court is required to look to the relevant state law to determine the elements of the crime.  *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).  Where facts presented at trial support conflicting inferences, a federal habeas court must presume that conflicts were resolved in favor of the prosecution.  *Jackson*, 443 U.S. at 326.  The court is not required to decide whether it believes the evidence at trial established guilt beyond a reasonable doubt, but whether any rational trier of fact could have found guilt beyond a reasonable doubt based on the evidence presented.  *See id.* at 319.  In making this assessment, a federal habeas court must "credit every inference that could have been drawn in the state's favor . . . whether the evidence being reviewed is direct or circumstantial."  *Reddy v. Coombe*, 846 F.2d 866, 869 (2d Cir. 1988), *cert. denied*, 488 U.S. 929 (1988).  The court is also permitted to "draw reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.

---

[8] Respondent does not address the sufficiency of the evidence with regard to Petitioner's convictions for driving while intoxicated (two counts) or reckless endangerment (two counts).

There is, moreover, no requirement that a criminal jury resolve evidentiary inconsistencies in the defendant's favor; rather, conviction of a criminal offense requires proof of the defendant's guilt beyond a reasonable doubt and the court is not required to resolve evidentiary inconsistencies in favor of the defendant.  *See United States v. Walsh*, 194 F.3d 37, 52 (2d Cir. 1999) (denying motion to vacate judgment as against the weight of the evidence based on inconsistent testimony as it is within jury's province to resolve evidentiary inconsistencies against defendant).  Thus, a federal habeas court must presume any inconsistencies in the evidence were resolved against a Petitioner. *Jackson*, 443 U.S. at 319.

Furthermore, a claim challenging the weight of the evidence provides no basis for habeas relief.  *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) ("assessments of the weight of the evidence or the credibility of witnesses are for the jury and not grounds for reversal on appeal; we defer to the jury's assessments of both of these issues.") (citing cases).  Rather, "weight of the evidence" claims derive, more precisely, from New York Criminal Procedure Law § 470.15(5), which permits an appellate court in New York to reverse or modify a conviction upon determining "that a verdict of conviction resulting in a judgment was, in whole or in part, against the weight of the evidence."  As such, claims challenging the weight of the evidence are matters of state statutory law, which are not cognizable on habeas review.  *See* 28 U.S.C. § 2254(a) (permitting federal habeas review only where the petitioner alleges he is in custody in violation of "the Constitution or a federal law or treaty"); *Lewis v. Jeffers*, 497 U.S. 764, 780 (holding habeas review not available to remedy alleged error of state law).

As discussed, *infra*, the instant record in the instant case demonstrates sufficient

evidence supports each of Petitioner's eight convictions.

### 1.    Manslaughter in the Second Degree

Petitioner argues in support of his challenge to the sufficiency of the evidence regarding the second degree manslaughter conviction that the prosecution failed to prove Briggs died from injuries sustained in the accident, rather than from an intervening cause, *i.e.*, an infection acquired at the hospital, breaking the chain of causation between any action by Petitioner and Briggs's death.  Petition ¶ 12(A) at 5, 5-A - 5-A2.  Respondent maintains that this argument essentially challenges the jury's acceptance of the evidence presented by the prosecution over evidence presented on behalf of the defense.  Respondent's Memorandum at 25-26.

Pursuant to New York law and as relevant to the instant case, a person is guilty of manslaughter in the second degree when "[h]e recklessly causes the death of another person . . . .  N.Y. Penal Law §125.15(1).  The court, upon a thorough review of the record, finds that sufficient evidence supports the jury's finding beyond a reasonable doubt that Petitioner recklessly caused Briggs's death and, as such, the state courts did not reject Petitioner's alleged due process violation in a manner outside the parameters set forth in § 2254(d).

Petitioner maintains that Dr. Samuel, testifying for the prosecution, and Dr. Shane, testifying for the defense, both conceded that the absence of any pus in Briggs's body did not preclude a conclusion that Briggs acquired an infection in the hospital, and that Dr. Shane testified that Briggs's hospital records, including treatment progress notes, provided "overwhelming evidence" that Briggs died of an infection acquired in the

29

hospital, rather than from an infection acquired through her wounds suffered in the

crash with Petitioner's vehicle.  Petition ¶ 12(A) at 5, 5-A - 5-A2.  According to

Petitioner, the prosecution's failure to present any hospital, medical or autopsy reports

reconciling the conflicting testimony between Drs. Samuel and Shane regarding Briggs's

cause of death establishes the evidence was insufficient to support Petitioner's

conviction for Second Degree Manslaughter, thereby constituting a due process

violation.  *Id*.  Such argument, however, essentially attacks the jury's determination that

Dr. Samuel's testimony was more credible than that presented by Dr. Shane and, as

such, goes to the weight, rather than the sufficiency, of the evidence, a contention which

provides no ground for habeas relief.  *Maldonado*, 86 F.3d at 35.

Furthermore, sufficient evidence was presented at trial establishing all the

elements of Petitioner's manslaughter charge.  In particular, Dr. Samuel, who performed

the autopsy of Briggs, testified that as a result of the collision, Briggs suffered lung

damage caused by respiratory distress syndrome.   (Tr. at 1288-90).  Dr. Samuel also

observed that all of Briggs's organs were slightly swollen, (Tr. at 1342), and that

Briggs's liver was swollen, yellow and accumulating fat, which was a common response

to injury. (Tr. at 1334-37). A significant accumulation of blood surrounding Briggs's left

kidney and sharp vascular markings on the kidney, such that the kidney's blood vessel

patterns were much stronger than normal, indicated a sudden shutdown of the kidney's

function. (Tr. at 1292).  Cultures taken from Briggs's various wounds and urine between

August 23 and 26, 2000, were all negative for sepsis, which Dr. Samuel explained is a

"severe overwhelming infection" that can lead to SIRS.  (Tr. at 1346-50).  A culture of

Briggs's sputum and a nasal swab culture, both taken on August 25, 2000, showed

staphylococcus, but nothing indicated that the presence of such bacteria had advanced to an infectious stage.  (Tr. at 1348, 1350-51).  Although Briggs had been given antibiotics since the initial surgical procedure, the antibiotics were given as a prophylactic measure, rather than to treat any infection present in Briggs's system prior to the accident or acquired during Briggs's hospital stay.  (Tr. at 1350-51).  It was Dr. Samuel's opinion that the autopsy findings were consistent with Systemic Inflammatory Response Syndrome ("SIRS") which, Dr. Samuel explained, "is a condition in which the body is under attack by a lot of chemical molecules that are produced in response to some injury.  (Tr. at 1296).  That injury can be infection, or that injury can be trauma, or that injury can be a major illness, like a heart attack or severe pancreatitis, or some catastrophic medical event."  (Tr. at 1296).  Dr. Samuel further testified that with SIRS, an injured body will supply more blood to the organs that need it most, including the heart and the brain, to the point that other organs will shut down, a situation referred to as multiple organ system failure, and that Briggs died from such multiple organ system failure as a result of SIRS caused by injuries sustained in the accident, rather than by sepsis, acquired by Briggs during treatment for her injuries, given the lack of any evidence of bacterial infection in Briggs.  (Tr. at 1296-98, 1353, 1355-57).

As stated, Fact, *supra*, at 13, Dr. Shane, testifying as an expert on Petitioner's behalf, attributed Briggs's death not to SIRS caused solely by injuries sustained in the accident but, rather, to pre-existing kidney and liver diseases, undiagnosed and untreated diabetes, and an infection acquired in the hospital.  (Tr. at 1802-1948).  Despite the contrasting conclusions reached by the experts witnesses, it is not within the province of the habeas court to question the jury's credibility determination.

*Maldonado*, 86 F.3d at 35.

In particular, even Dr. Shane's opinion, carefully reviewed, did not completely negate the effects of the trauma suffered by Briggs in the collision as a causative factor contributing to Briggs's death.  Thus, as the jury had before it testimony from Petitioner's own witness that provided a factual basis upon which the jury could reasonably find demonstrated the collision was a legally causative factor resulting in Briggs's death, such evidence is fatal to Petitioner's assertion that the evidence against him on this issue was constitutionally insufficient.

The record thus establishes that Petitioner's conviction for second degree manslaughter is supported by the evidence.

### 2.    Vehicular Manslaughter in the Second Degree

Petitioner argues in support of his challenge to the vehicular manslaughter conviction that the prosecution failed to prove beyond a reasonable doubt that Petitioner was driving while intoxicated, that Petitioner acted with criminal negligence in driving his vehicle, and that Petitioner actually caused the accident.  Petition ¶ 12(A) at 5-A3 - 5-A5.  According to Petitioner, although Deputy Milford testified on behalf of the prosecution that Petitioner's vehicle, while traveling north on East Franklin Street, crossed into the southbound lane and struck Briggs's vehicle, (Tr. at 96-222), Hable testified that the accident occurred near a blind curve in the road, and that a white vehicle traveling directly in front of Briggs's vehicle, in rounding such curve, had driven close to the center line, causing Petitioner to swerve toward the right shoulder of Petitioner's lane, and then to overcorrect by veering into the oncoming lane, missing the

white vehicle, but colliding with Briggs's vehicle.  (Tr. at 384-86).  Accident

reconstruction expert Workman, testifying as a defense witness, pointed to gouge

marks in the road surface at the scene of the accident indicating the collision occurred

closer to the center of the road, rather than in the middle of Brigg's southbound lane.

(Tr. at 1451, 1467, 1470, 1489).  Petitioner maintains that no evidence introduced at

trial established how closely Briggs's vehicle was following the white vehicle, nor the

precise location of Briggs's vehicle in the road at the time of the collision, such that

Petitioner's assertion in being questioned after the accident that he swerved to avoid the

other vehicle is unrebutted.  Petition ¶ 12(A) at 5-A3 - 5-A5.  Respondent argues in

opposition that Petitioner is challenging the jury's acceptance of the evidence presented

by the prosecution over the evidence presented by the defense, which is not reviewable

in this habeas proceeding.  Respondent's Memorandum at 27-28.

At the time of Petitioner's arrest and conviction, the relevant statute provided that

[a] person is guilty of vehicular manslaughter in the second degree when he:

> (1) commits the crime of criminally negligent homicide as defined in section
> 125.10, and . . .
> (2) causes the death of such other person by operation of a vehicle in violation of
> subdivision two, three or four of section eleven hundred ninety-two of the vehicle
> and traffic law . . . .

N.Y. Penal Law § 125.12(1).[9]

"Criminally negligent homicide" is defined as acting with criminal negligence in causing

the death of another person.  N.Y. Penal Law § 120.10.  Further, a person acts with the

---

[9] In 2005, the relevant statute was amended by removing the criminally negligent homicide
requirement, thereby providing that a person was guilty of vehicular manslaughter in the second degree
upon operating a vehicle, while intoxicated, in such a manner as to cause the death of another person.

culpable mental state of "criminal negligence"

> when he fails to perceive a substantial and unjustifiable risk that such result will occur or that such circumstance exists.  The risk must be of such nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

N.Y. Penal Law § 15.05(4).

Furthermore, New York Vehicle and Traffic Law § 1192 provides, in pertinent part, that a person is guilty of driving while intoxicated ("DWI") when he operates a motor vehicle while having a blood alcohol content of at least .10 % as shown by chemical analysis of such person's blood, breath, urine or saliva.  N.Y. Veh. & Traf. Law § 1192(2).[10]  A plain reading of the instant record establishes sufficient evidence to support the jury's determination that Petitioner caused the accident in which Briggs's sustained her fatal injuries.

Such evidence included that Petitioner was, at the time of the accident, driving while intoxicated in violation of N.Y. Veh. & Traf. Law § 1192(2).  Specifically, Petitioner failed the field sobriety tests on two occasions, including at the scene of the accident, and at the Sheriff's Department.  (Tr. at 278-82, 293-95, 339-47).  Petitioner also registered a BAC of .21% on a breathalyzer test administered at the Sheriff's Department, more than two hours after the accident.  (Tr. at 299, 1721).  This evidence is sufficient to establish the driving while intoxicated element of the second degree vehicular manslaughter conviction.  The record as a whole also establishes more than sufficient evidence existed to support the jury's conclusion that Petitioner, despite his

---

[10] In 2002, the statute was amended to lower the requisite blood alcohol content for a DWI violation to .08%.

intoxicated state, including a blood alcohol content that registered more than twice the limit for a DWI charge more than two hours after the accident, decided to drive, thus satisfying the element that Petitioner have a criminally negligent culpable mental state.

Insofar as Petitioner is challenging the jury's acceptance of the evidence presented by the prosecution over the evidence presented by the defense, the jury's decision goes to the weight, rather than the sufficiency, of the evidence, which is not reviewable in this habeas proceeding.  *Maldonado*, 86 F.3d at 35.  Additionally, even Petitioner's accident reconstruction expert's testimony confirmed that Briggs's vehicle was struck while it was within its own lane, thus allowing the jury to find that Petitioner crossed into the on-coming traffic over the centerline in the East Franklin Street roadway.  That Petitioner may have swerved to the right of his lane to avoid colliding with the unidentified white vehicle traveling directly in front of Briggs's vehicle, and then overcorrected from the swerve, colliding with Briggs, does not negate the fact that substantial evidence, including that presented by Petitioner's expert, Workman, established it was Petitioner who crossed into Briggs's lane, that Petitioner's intoxicated state led to any overcorrection in steering and related lack of control over his vehicle, and was, thus, responsible for the fatal crash.

In sum, a plethora of evidence supports the jury's determination that Petitioner was guilty of vehicular manslaughter in the second degree, that the state court did not improperly reject Petitioner's federal due process argument and, as to this claim, the Petition should be DISMISSED.

### 3.    Driving While Intoxicated

Although Petitioner does not set forth a separate argument regarding his driving while intoxicated conviction, he does separately list it as being challenged, and discusses the evidence regarding his intoxicated state in connection with his challenge to the vehicular manslaughter conviction.  Petition ¶ 12(A) at 5-A2 - 5-A3.  Respondent has not responded to this ground.  At the time of Petitioner's arrest and conviction, the relevant statute provided that a person is guilty of DWI when he operates a motor vehicle while having a blood alcohol content of at least .10 % as shown by chemical analysis of such person's blood, breath, urine or saliva.  N.Y. Veh. & Traf. Law § 1192(2).

As discussed in connection with Petitioner's challenge to the sufficiency of the evidence regarding the DWI element of his vehicular manslaughter conviction, Discussion, *supra*, at 32-35, evidence was presented from which a jury could find that Petitioner was, at the time of the accident, driving while intoxicated in violation of N.Y. Veh. & Taf. Law § 1192(2).  Specifically, evidence at trial established Petitioner failed the field sobriety tests on two occasions, including at the scene of the accident, and at the Sheriff's Department, (Tr. at 278-82, 293-95, 339-47), and also registered a BAC level of .21% on a breathalyzer test administered at the Sheriff's Department, more than two hours after the accident, reasonably implying Petitioner's BAC at the time of the crash was higher.  (Tr. at 299, 1721).   Significantly, the breathalyzer test result was more than twice what was necessary to establish a violation of the driving while intoxicated statute.

Accordingly, more than sufficient evidence supports the jury's determination that Petitioner was guilty of DWI, and the state courts did not improperly reject Petitioner's

due process ground for reversal of his conviction.   The Petition should therefore be DISMISSED as to this claim.

### 4.      Leaving the Scene of an Accident without Reporting

Petitioner asserts that the trial evidence failed to establish the requisite *mens rea* that Petitioner knowingly and intentionally left the scene of the accident, asserting that he was only trying to get help "as soon as physically possible," maintaining that although Petitioner, immediately following the collision, exited his vehicle and walked into a nearby field, he did so with the intention of obtaining help from a nearby farmhouse.   Petition ¶ 12(A) at 5-A6.   In opposition, Respondent maintains that sufficient evidence supports the conviction for leaving the scene of an accident, and that even Petitioner's own trial testimony establishes that Petitioner entered the nearby field not to seek help, but to vomit and lie down.   Respondent's Memorandum at 28-29.

As relevant to the instant case, a person is guilty of leaving the scene of an accident without reporting when such person, with knowledge that he has, as the driver of a motor vehicle, been involved in an incident causing injury to another person, leaves the place of such personal injury without first stopping and exhibiting his driver's licence and insurance identification card for such vehicle, and providing to the injured party other identifying information, including name, residence, insurance carrier and insurance identification information and, where practical, to a police officer.   N.Y. Veh. & Traf. Law § 600(2)(a).   Sufficient trial evidence supports the jury's conclusion that Petitioner was guilty of leaving the scene of an accident without reporting it.

Such evidence includes the fact, undisputed by Petitioner, that immediately after

the accident, Petitioner exited his vehicle and entered a nearby field, as was witnessed

by a bystander.  (Tr. at 266, 313-14, 319, 328).  When Petitioner was located by

Chemung County Sheriff Deputy Argetsinger, Petitioner was crouching down on one

knee beside a barn located behind a residence facing East Franklin Street.  (Tr. at 472).

Deputy Argetsinger identified himself as a Deputy Sheriff and ordered Petitioner to stop,

but Petitioner responded by running away from Deputy Argetsinger.  (Tr. at 473-74).

When Deputy Ruhmel joined Deputy Argetsinger in the field, the deputies asked

Petitioner his name several times, which Petitioner refused to provide.  (Tr. at 273-74,

477-78).  Based on this evidence the jury could find that Petitioner did not enter the field

to seek help for the accident victims but, rather, to avoid being detected while he was

inebriated.  Moreover, Petitioner's questions to the deputies, as to whether the

occupants of the vehicle with which Petitioner's vehicle had collided were "okay," and

that Petitioner recalled hearing screaming and crying emanating from Briggs's vehicle

(Tr. at 275, 359), establishes Petitioner knew the occupants of Briggs's vehicle were

injured.  Further, Petitioner testified at trial that he entered the nearby field to vomit and

lie down.  (Tr. at 1273).  Notably absent from Petitioner's testimony is any statement

that he intended to return to the scene.  This evidence sufficiently establishes the

elements of a leaving the scene of an accident without reporting violation.

As such, the state courts did not improperly reject Petitioner's federal due

process contention on appeal, and the Petition should be DISMISSED as to this claim.

### 5.      Assault in the Third Degree

Petitioner maintains there was insufficient evidence to support his conviction for

assault in the third degree based on any injury to three-year old Noah who did not testify

at trial and for whom no medical records were introduced.  Petition ¶ 12(A) at 5-A7-A8.

Respondent argues in opposition that although Noah did not testify and no medical

records pertaining to Noah were presented as evidence, sufficient evidence establishing

Noah's injuries was otherwise introduced at trial.  Respondent's Memorandum at 29.

A person is guilty of assault in the third degree when, as relevant, "[h]e recklessly

causes physical injury to another person. . . ."  N.Y. Penal Law § 120.00(2).  "Physical

injury" is defined as "impairment of physical condition or substantial pain."  N.Y. Penal

Law § 10(9).  The record contains sufficient evidence to support the elements of a

conviction for third degree assault with regard to Noah.

In particular, eyewitnesses at the scene of the accident testified, including Hable,

McInnerny and Clark, testified that following the accident, Noah was strapped into his

child restraint seat inside Briggs's vehicle, screaming and crying with a large bump on

his forehead.  (Tr. at 389, 396, 794-95, 895-96).  In particular, Hable testified the little

boy "had a pretty good goose bump oh his forehead" and "a little bit of blood on the

back of his head."  (Tr. at 389).  McInnerny described the boy's injury as "a very large

knot" located on his forehead, "the size of about a half a baseball almost," and recalled

the boy was crying and screaming.  (Tr. at 794-95).  Clark described Noah has having

"a large lump on his forehead," the size of "half a golf ball" that "protruded out quite a

ways."  (Tr. at 895-96).  Paramedic John Moretz testified that Noah sustained a "large

hematoma" to his head (Tr. 861), and volunteer fireman Sweet testified that Noah had a

"goose egg" the size of a "golf ball" on his forehead.  (Tr. at 675).

Noah's mother, Tina Briggs, testified that when she saw Noah after the accident

at the hospital, Noah's head looked deformed, that "[i]t looked like he had a big softball stuck to the top of his head," and that Noah's eyes were bruised underneath.  (Tr. at 80-81).  Noah sustained a cut to his jawbone and as of the trial, Noah still had a small bump on his forehead, complained of pain in his jaw, and referred to a bump in his jaw as "a nail."  (Tr. at 82-84).  Noah also sustained an injury to his arm requiring a sling. (Tr. at 90).  According to his mother, for two weeks following the accident, Noah was "in a lot of pain" for which he was medicated with Tylenol with codeine, the effects of which "wore off within four hours," but which could not be given again for six hours, and that Noah would cry and scream during the two hours he had to wait before his next dose of the Tylenol.  (Tr. at 82-83).

This evidence was sufficient to support the jury's determination that Noah suffered an "impairment of physical condition" or "substantial pain" as a result of the accident caused by Petitioner, such that affirmance of Petitioner's conviction for third degree assault was neither contrary to nor an unreasonable application of federal law as to Petitioner's assertion of a due process violation.  Accordingly, the Petition should be DISMISSED as to this claim.

### 6.    Reckless Endangerment on the Second Degree

Petitioner asserts his convictions on two counts of reckless endangerment with regard to the injuries to Noah and Briggs were not based on sufficient evidence because the prosecution failed to introduce sufficient evidence to establish such charges beyond a reasonable doubt.  Petition ¶ 12(A) at 5-A8.  Respondent has not responded to this claim.

"A person is guilty of reckless endangerment in the second degree when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person."  N.Y. Penal Law § 120.20.  "Serious physical injury" is defined as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health, or protracted loss or impairment of the function of any bodily organ."  N.Y. Penal Law § 10.00(10).  Here, the record establishes sufficient evidence was introduced supported Petitioner's convictions on two counts of second degree reckless endangerment with regard to Noah and Briggs.

With regard to Briggs, as discussed in connection with Petitioner's second degree manslaughter and vehicular manslaughter convictions, Discussion, *supra*, at 28-35, the trial evidence sufficiently established that Petitioner, by consuming alcohol and then driving while in an intoxicated state, caused a collision resulting in fatal injuries to Briggs.  Such evidence also supports Petitioner's reckless endangerment conviction given that the injuries Briggs sustained in the accident, which resulted from Petitioner's reckless conduct in driving while intoxicated, caused Briggs's death.

Further, although Noah did not sustain fatal injuries as a result of the accident, numerous witnesses testified that Noah's injuries included a disfiguring lump in the middle of his forehead, ranging in size from half a golf ball (Tr. at 895-96) to a softball (Tr. at 80-81), and which was still present, albeit smaller, more than five months later at Petitioner's trial.  (Tr. at 82-84).  As such, the evidence sufficiently supports the jury's conclusion that Petitioner was guilty of second degree reckless endangerment based on the injuries sustained by Noah in the accident, and there is no basis to find the state

41

courts misapplied federal law as to this issue.

The Petition therefore should be DISMISSED as to this claim.


The record thus contains sufficient evidence to support all of Petitioner's convictions, the state courts did not err in finding there was no violation of Petitioner's federal due process rights, and the Petition should be DISMISSED as to this ground.


**B.    Second Ground - Failure to Recuse**

Petitioner asserts that Judge Hayden should have recused himself as trial judge because, at Petitioner's arraignment, Judge Hayden stated that 14 years earlier Judge Hayden, then working as an assistant district attorney, prosecuted Petitioner in another case in which Petitioner was convicted of driving while intoxicated, causing an accident that seriously injured a passenger in another vehicle, and that Judge Hayden had wanted a harsher sentence for Petitioner in connection with the earlier conviction, but that the victim was more forgiving.[11]  Petition ¶ 12(B) at 5, 5-A8 - 5-A9; Respondent's Exhs. A (Appellant's Brief) at 51-53; B (Defendant/Appellant's Supplemental Brief) at 6-

---

[11] The state court records do not contain any copy of the transcript of Petitioner's arraignment proceedings.  The parties, however, do not dispute the accuracy of the relevant portions of the arraignment, as recited by Petitioner in support of the Petition.  Specifically, on direct appeal of Petitioner's conviction to the Appellate Division, the relevant portion of the arraignment was presented as follows:
. . . Mr. Curkendall drove through a stop sign while intoxicated and broadsided this car, in which this lady from England was riding, causing extremely serious injuries to her . . . . The experience I [Judge Hayden] had dealing with the lady from England, who is quite an unforgettable person . . . In fact, it was because of that lady that your client received the sentence that he did . . . . He was looking at a much longer sentence in prison.  But for the entreaties of the lady not to put your client's life in dire straights, he might have received a much greater sentence.  So, she was quite forgiving.  And that's why I remember that case.
Respondent's Exh. F (Defendant/Appellant's Reply Brief) at 9 (quoting Transcript of Petitioner's Arraignment at 40-41).

7; C (*Pro Se* Supplemental Brief on Appeal) at 7-10; D (*Pro Se* Supplemental Brief) at

6-7; F (Defendant/Appellant's Reply Brief) at 9-10; H (Application for Leave to Appeal to

the Court of Appeals) at 3.[12]   Judge Hayden also commented during Petitioner's

arraignment that Briggs had been a Chemung County Court employee, specifically, a

court clerk.   *Id*.   Petitioner further challenges Judge Hayden's comment during jury

selection that "the family of the victim lost a loved one as a result of what has occurred,"

(Tr. at 187), asserting that such statement contradicted the defense theory that Briggs

died not as a result of the accident but, rather, as a result of medical malpractice on the

part of the hospital.   Respondent's Exh. B at 6-7.   Petitioner further maintains that

because Briggs, the decedent in the instant case, had been, at the time of her death, a

Chemung County Court employee, it was likely that Judge Hayden and Briggs had prior

work-related contact, further creating the appearance of impropriety and prejudice

against Petitioner.   Petition ¶ 12(B) at 5-A9; Respondent's Exhs. A at 51-53; B at 6-7; C

at 7-10; H at 3.   Respondent argues in opposition to habeas relief that absent a direct,

personal, substantial or pecuniary interest in the outcome of a criminal proceeding or

action, a judge is not required to recuse himself despite prior contact with the defendant.

Respondent's Memorandum at 30-31.

"'[M]ost matters relating to judicial disqualification [do] not rise to a constitutional

level.'"   *Brown v. Doe*, 2 F.3d 1236, 1248 (2d Cir. 1993) (quoting *FTC v. Cement

Institute*, 333 U.S. 683, 702 (1948) (bracketed text in original).   Rather, due process

---

[12] As discussed, Discussion, *supra*, at 24-25, the undersigned addresses the merits of Petitioner's
Second Ground for habeas relief only in the alternative should the District Judge disagree with the
undersigned's initial recommendation that the Second Ground be dismissed for failure to comply with the
AEDPA's exhaustion requirements, and as procedurally defaulted.

requires the disqualification or recusal of a judge only in the most extreme cases of demonstrated bias or prejudice.  *See, e.g., Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 821-22 (1986) (holding member of highest Alabama state court was required to recuse himself from an action against an insurance company alleging bad-faith refusal to pay valid claim, given that judge had pending at least one very similar bad faith refusal-to-pay action against another insurer in another court in the same state).  Nor do mere allegations of judicial bias or prejudice state a due process violation.  *Brown*, 2 F.3d at 1248 (citing *Lavoie*, 475 U.S. at 820).  Further, whereas "matters of kinship, personal bias, state policy, remoteness of interest, would seem generally to be matters merely of legislative discretion," *Tumey v. Ohio*, 273 U.S. 510, 523 (1927), "[t]he constitutional validity of a judge's qualifications is not implicated unless the judge has a 'direct, personal, substantial pecuniary interest' in reaching a particular conclusion in a case."  *Brown*, 2 F.3d at 1248 (quoting *Tumey*, 273 U.S. at 523 (holding mayor of village, who convicted habeas petitioner for unlawfully possessing intoxicating liquor, had a direct personal pecuniary interest in convicting the petitioner given that such conviction would result in a fine of $ 12 imposed on the petitioner for costs, which would not have been received had the petitioner been acquitted)).

With regard to the Petition, upon *de novo* review, as required for this unexhausted claim, *Washington*, 255 F.3d at 55, nothing in the record establishes that Judge Hayden possessed any "direct, personal, substantial pecuniary interest" in convicting Petitioner on the pending charges, in violation of any rule of federal Constitutional law.  In the absence of any such evidence, the Petition should be DISMISSED on this ground.

44

### C.    Third Ground - Jury Impartiality

Petitioner alleges that his Sixth Amendment right to a fair and impartial jury was violated by the selection of several jury members, including Brenda Post ("Post"), Ralph Sutter ("Sutter"), John Harter ("Harter"), Susan Walker ("Walker"), and Roswell Steadman ("Steadman"), each of whom either knew at least one or more trial witnesses or made statements during *voir dire* indicative of an inability to serve with impartiality. Petition ¶ 12(C) at 6, 6-A1 - 6-A4.  Respondent argues in opposition that Petitioner has failed to rebut the presumption of impartiality by demonstrating actual evidence of prejudice as to any of these jurors.  Respondent's Memorandum at 32-35.  In further support of habeas relief, Petitioner maintains that his convictions were based on information possessed by each of the jurors whom Petitioner alleges was impartial, rather than solely on evidence presented at trial.  Petitioner's Reply at 11-15.

The Sixth Amendment guarantees a defendant the right to a trial by an impartial jury.  *Duncan v. Louisiana*, 391 U.S. 145, 159 (1968).  It is within the trial court's discretion whether to grant or deny a challenge for cause and a denial of such a challenge will not support a petition for habeas relief unless the asserted disqualifying fact was so prejudicial that the refusal denied the defendant of a fundamentally fair trial. *Duran v. Keane*, 1997 WL 204312, *2 (N.D.N.Y. 1997) (citing  *Sudds v. Maggio*, 696 F.2d 415, 416 (5th Cir. 1983)).  In considering a petition for relief under § 2254(d), the state trial court's conclusion that the jury was impartial is entitled to a presumption of correctness.  *Knapp v. Leonardo*, 46 F.3d 170, 175-76 (2d Cir. 1995), *cert. denied*, 515 U.S. 1136 (1995) (citing *Wheel v. Robinson*, 34 F.3d 60, 65 (2d Cir.1994) (trial court's findings on jury bias entitled to § 2254(e)(1) (formerly § 2254(d)) presumption of

correctness)).  According to the Supreme Court, "the trial court's findings of impartiality [may] be overturned only for 'manifest error.' " *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (quoting *Irvin v. Dowd*, 366 U.S. 717, 724 (1961)).

In particular, it is the petitioner's burden to show the " 'actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' " *Irvin*, 366 U.S. at 723 (quoting *Reynolds v. United States*, 98 U.S. 145, 157, (1878)); *see also Murphy*, 421 U.S. 794, 800 (1975) (defendant must show actual existence of prejudice to overcome juror's assurances of impartiality).  Further, the mere existence of any preconceived notion as to a defendant's guilt or innocence is, without more, insufficient to rebut the presumption of impartiality provided the juror demonstrates he "can lay aside his impression or opinion and render a verdict based on the evidence presented in court."  *Irvin*, 366 U.S. at 723.

In this case, the record does not support a finding that the presence on the jury of Post, Sutter, Harter, Walker, or Steadman resulted in a jury that was other than fair and impartial.  Specifically, although Petitioner asserts Post should not have been seated as a jury because prospective witness Cafolla was Post's brother-in-law, and Post was employed as a corrections officer (Petition ¶ 12(C) at 6-A1), Post, during *voir dire*, assured the court that she and Cafolla were not close, she saw Cafolla only twice a year at family gatherings, and that her relationship with Cafolla would have no effect on Post's ability to be fair and impartial.  (VD[13] at 47-48).  Moreover, the record establishes that Cafolla was Petitioner's friend, and that Petitioner's case relied, in part, on the fact

---

[13] References to "VD" are to the page number of the *voir dire* of the venirepersons contained in Volumes 1 and 2 of the state court record.

that on the day of the accident, Petitioner had stopped at Cafolla's home where

Pesesky observed that Petitioner did not appear intoxicated.  (Tr. at 1391-99, 1571-72).

Petitioner has thus failed to demonstrate any evidence rebutting Post's assurance that

she would serve as an impartial juror so as to establish actual prejudice.  *Irvin*, 366 U.S.

at 273.  As such, Petitioner has failed to establish juror impartiality based on Post's

selection for the jury.

Petitioner alleges that Sutter should not have been selected as a juror because

Sutter used to work with, and remained friends with, prospective eyewitness Arthur

Clarke ("Clarke"), and because, as a car salesman, Sutter possessed information

regarding how automobiles absorb energy during collisions.  Petition ¶ 12(C) at 6-A1 -

6-A2.  The record establishes that during *voir dire*, despite admitting he considered

Sutter as "a very honest man," and that it would be difficult not to let Sutter's relationship

with Clarke affects his assessment of Clarke's credibility, Sutter nevertheless assured

that, upon instruction from Judge Hayden, he would not let his personal relationship with

Clarke affect Sutter's assessment of Clarke's credibility.  (VD at 44).  In response to

further questioning, Sutter stated that although he had acquired, from his work as a car

salesman, some knowledge of safety devices and crumple zones, referring to"how a car

is supposed to crumple in a collision," such knowledge would not affect his ability to

base any verdict solely on the evidence presented during Petitioner's trial.  (VD at 114-

15).  Such statements are insufficient to rebut the presumption of a juror's impartiality

and, as such, provide no basis for habeas relief with regard to Sutter.

Petitioner maintains that Harter should not have been selected as a juror

because Harter gave equivocal responses when questioned by the prosecutor, without

objection, as to whether Harter could tell solely by observing a person whether the person was guilty or innocent.  Petition ¶ 12(C) at 6-A2.  In particular, when asked, "Do you think you know how an innocent person would behave in a courtroom, charged with these crimes?", Harter responded, "Probably."  (VD at 119).  In response to the question whether, should Petitioner testify, "do you think you will be able to tell whether he's innocent by looking at the way he behaves or the way he answers the questions?", Harter replied "Maybe."  (VD at 120).  Such answers, however, do not indicate that Harter was anything other than impartial with regard to the charges pending against Petitioner who did testify.  In fact, Harter's responses demonstrate only that Harter might rely on his personal observation during trial of the demeanor of the testifying witnesses, including Petitioner, in reaching a verdict on the charges pending against Petitioner, which is specifically permitted.  *See Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (observing jurors "must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions," such that an appellate court cannot "easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.").  In any event, Petitioner fails to point to any response by Harter sufficient to rebut the presumption of Harter's impartiality, as required, *Irvin*, 366 U.S. at 723, and the Petition fails on this ground as to Harter.

Petitioner asserts Walker, who worked as a nurse at Arnot Ogden Hospital where she used to be Director of the Intensive Care Unit, should not have been seated as a juror because of her medical knowledge.  Petition ¶ 12(C) at 6-A2.  The record establishes that although Walker admitted that in listening to testimony regarding

Briggs's injuries and treatment that it would not be easy to forget her medical knowledge and training, Walker also assured her medical knowledge and training would not render her incapable of being an impartial juror.  (VD at 250-51).  Petitioner has failed to point to any evidence sufficient to overcome the presumption of juror impartiality as to Walker.  As such, the Petition also fails on this ground with regard to Walker.

Finally, Petitioner maintains that Steadman, who admitted that the fact that the case against Petitioner involved a fatality, could cause Steadman to hesitate in reaching a conclusion of "not guilty," should not have been seated as a juror.  Petition ¶ 12(C) at 6-A2.  A plain reading of the record, however, establishes that Steadman repeatedly reassured Judge Hayden that Steadman possessed no preconceived notions as to whether it would be easy or difficult to decide the case and had no opinion as to Petitioner's guilt.  (VD at 242-44).  In fact, the exchange to which Petitioner points as establishing Steadman's partiality includes Mr. Joch's question, "Would the fact that there is a fatality make you hesitate to vote not guilty in this case?  That fact alone, that there was a fatality, as there is in many traffic accidents which have nothing to do with criminal cases, would that stop you from voting a not guilty verdict for even a second?" (VD at 243-44).  Steadman replied, "I could hesitate, but I can't answer that at this time." (VD at 244).  In contrast to Petitioner's assertion, this exchange falls short of rebutting the presumption of impartiality sufficient to warrant habeas relief, *Irvin*, 366 U.S. at 723, and, as to Steadman, this ground fails.

Petitioner thus has failed meet his burden of proof as to this argument and, therefore, the state courts did not improperly reject Petitioner's Sixth Amendment claim on this basis.  Accordingly, the Petition for habeas relief is, on this ground, DISMISSED.

**D.      Fourth Ground - Ineffective Assistance of Trial Counsel**

As his final ground for habeas relief, Petitioner asserts he was denied affective

assistance of trial counsel when his trial counsel, Joseph Joch, Esq. ("Joch"), failed to

(1) request a *Huntley* hearing[14] to move to suppress a statement Petitioner made to law

enforcement officials without an attorney present that Petitioner "felt a 'little intoxicated'";

(2) exercise peremptory challenges against jurors Post, Sutter, Harter, Walker, Hazlett,

and Steadman; (3) object to a comment made by Judge Hayden indicating Judge

Hayden believed Petitioner's drunk driving caused Briggs's death; and (4) include Keith

Workman on the list of defense witnesses until after the jury was selected such that it

was unclear whether any of the jurors had any bias toward Workman.  Petition ¶ 12(D)

at 6-A4 - 6-A5.  Respondent maintains that Petitioner has failed to set forth any

argument sufficient to overcome the strong presumption that Joch's representation of

Petitioner, including the four specific issues raised by Petitioner, was comprised of

anything less than "sound trial strategy."  Respondent's Memorandum at 36-37 (quoting

*Strickland v. Washington*, 466 U.S. 668, 689 (1984)).

A claim of ineffective assistance of counsel must be evaluated according to the

standards established in *Strickland v. Washington*, 466 U.S. 668 (1984) ("*Strickland*").

In particular, in adjudicating a claim of actual ineffectiveness of counsel, "the court

should be concerned with whether, despite the strong presumption of reliability, the

result of the particular proceeding is unreliable because of the breakdown in the

---

[14] In a *Huntley* hearing, the trial judge considers the voluntariness of statements made by the
defendant.  *People v. Huntley*,  204 N.E.2d 179 (N.Y. 1965).

adversarial process that our system counts on to produce just results." *Strickland,* 466 U.S. at 687-88. "Judiciary scrutiny of counsel's performance must be highly deferential." *Id.* at 689. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id*. Rather, under *Strickland*, to establish that he was convicted in violation of his right to effective assistance of counsel, a habeas petitioner must satisfy both prongs of the rigorous and highly demanding two-part test articulated in *Strickland*, including that "'counsel's performance was deficient' *and* 'that the deficient performance prejudiced the defense.'" *Pavel v. Hollins*, 261 F.3d 210, 216 (2d Cir. 2001) (quoting Strickland, 466 U.S. at 687, and citing *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001), and *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986)).

With regard to the first prong, *i.e.*, whether an attorney's conduct was deficient, "[t]he court must . . . determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To establish the second prong, whether the petitioner was prejudiced by his attorney's constitutionally deficient performance, the petitioner must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In this context, a "reasonable probability" is one that "undermine[s] confidence in the outcome." *Pavel*, 261 F.3d at 216.

Here, a thorough review of the state court record establishes there is no merit to

this asserted ground for habeas relief.

### 1.    Suppression of Statement

Petitioner asserts that Joch should have requested a *Huntley* hearing and moved to suppress Petitioner's admission on an unspecified videotape that Petitioner "felt a 'little intoxicated,'" and that such admission undermined Petitioner's contention at trial that he was not intoxicated at the time of the accident.  Petition ¶ 12(D) at 6, 6-A4. Respondent argues in opposition that Petitioner fails to provide any basis for suppressing such statement.  Respondent's Memorandum at 38-39.

Preliminarily, the court observes that Petitioner fails to describe the asserted videotape with any specificity, and a cursory review of the entire trial transcript fails to reveal precisely when, or even if, such videotape was played to the jury.  Nor does Petitioner indicate whether such alleged statement, made outside the presence of counsel, was made before or after Petitioner was given his Miranda warning, a fact undisputed by Petitioner, and was made in response to any law enforcement official's question, or was voluntarily uttered, thus waiving the right to counsel.  Significantly, the court is not obligated to scour the record to ascertain the precise nature of Petitioner's argument, even in light of his *pro se* status.  *See Knight v. Walsh*, 524 F.Supp.2d 255, 301 (W.D.N.Y. 2007) (stating, in context of habeas challenge to effectiveness of trial counsel's assistance, that "it is not the court's duty to construct an argument that Petitioner has failed to present." (citing *Garcia v. Warden, Dannemora Correctional Facility*, 613 F.Supp. 302, 306 (S.D.N.Y. 1985) (finding it inappropriate for court to "scour the record in search of some justification for petitioner's default, or to construct

an 'actual prejudice' argument for him."), *aff'd*, 795 F.2d 5 (2d Cir. 1986)).

Not only has Petitioner failed to adequately explain the factual basis for this claim, Petitioner has also failed to establish any facts on which the court could find that there exists a reasonable probability that the admission of such statement undermines confidence in the outcome of Petitioner's trial. *Pavel*, 261 F.3d at 216. As such, the state courts did not improperly reject Petitioner's Sixth Amendment argument, and the court need not further address this argument. Accordingly, the Petition is without merit as to this contention.

### 2.    Peremptory Challenges

Petitioner maintains Joch rendered ineffective assistance of counsel by failing to exercise peremptory challenges during jury selection with regard to Post, Sutter, Harter, Walker, Hazlett, and Steadman. Petition ¶ 12(D) at 6-A4. In opposition, Respondent argues that Joch's decision whether to exercise a peremptory challenge is a strategic decision, which does not rise to a constitutional error.

Petitioner has not articulated any basis for finding that Joch's decision not to exercise peremptory challenges as to Post, Sutter, Harter, Walker, Hazlett and Steadman was outside the wide range of professionally competent assistance, *Stickland*, 466 U.S. at 690, or that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In fact, as discussed in connection with Petitioner's direct challenge to the seating of Post, Sutter, Harter, Walker and Steadman as jurors, Discussion, *supra*, at 44-49, the record is devoid of any evidence rebutting the presumption of impartiality of

any of these jurors sufficient to warrant habeas relief.  *Irvin*, 366 U.S. at 723.

Furthermore, Petitioner has failed to demonstrate he requested Joch exercise any challenges as to there jurors and, as such, Petitioner is deemed to have acquiesced in Joch's decision not to do so.  *See U.S. ex rel. Reid v. Richmond*, 295 F.2d 83, 89 (2d Cir. 1961) (defendant's acquiescence competent counsel's trial strategy in state court amounted to forfeiture or right to challenge in subsequent habeas proceeding such strategy as constitutional infirmity).  Further, Petitioner has failed to articulate any basis for his assertion that but for Joch's failure to exercise a peremptory challenge with regard to Hazlett, there is a reasonable probability that the outcome of Petitioner's trial would have been different.  *Pavel*, 261 F.3d at 216.  Nor, as discussed, is the court required to "scour the record" to construct such an argument on Petitioner's behalf. *Knight*, 524 F.Supp.2d at 301.

Accordingly, there is no merit to any Sixth Amendment claim on this basis, and the state courts properly rejected it.

### 3.    Judge Hayden's Comment

Petitioner asserts Joch's failure to object to Judge Hayden's comment during jury selection that the family of the victim "obviously lost a loved one as a result of what has occurred," (VD at 187), maintaining that such statement indicated Judge Hayden's belief that Petitioner's alleged drunk driving caused Briggs's death.  Petition ¶ 12(D) at 6-A4. Respondent argues that Petitioner has "stretched the import of this remark" beyond what Judge Hayden intended, as is evident when the remark is read in its complete

context.  Respondent's Memorandum at 41.

The record establishes that immediately preceding Judge Hayden's remark regarding the death of Briggs "as a result of what has occurred," (VD at 187), Judge Hayden also remarked that a case like Petitioner's was likely to evoke emotions for both sides, given that Petitioner had a family, and Briggs's family "lost a loved one."  *Id*.  As such, a plain reading of the *voir dire* transcript establishes that Judge Hayden was merely attempting to elicit from the venireperson being questioned whether he could set aside emotions that may be felt for both sides in reaching a verdict, specifically asking "can you set those emotions aside and decide this case based upon the evidence that's introduced as to what occurred?"  (VD at 187).  Furthermore, the potential juror to whom such question was posed stated he was "not sure" he could set aside such emotions, and was excused for cause.  *Id*.  It is significant that none of Judge Hayden's remarks would preclude a determination that Briggs's death resulted not directly from her injuries but, rather, from an infection Briggs acquired in the hospital, which aggravated preexisting conditions, including untreated diabetes, leading to Briggs's death, the very defense asserted by Joch on Petitioner's behalf at trial.

Accordingly, Petitioner has failed to present any evidence establishing that but for Joch's failure to move to have Judge Hayden's comment suppressed, the outcome of his trial would have been different.  *Pavel*, 261 F.3d at 216.  As such, there is no merit of a constitutional dimension and the state courts properly rejected this aspect of Petitioner's ineffective assistance of trial counsel claim.

### 4.    Failure to Include Workman on Defense Witness List

Petitioner asserts that no strategy can explain Joch's decision not to include Workman on the list of defense witnesses until after the jury was selected and sworn, such that it is not possible to know whether any seated juror had any bias toward Workman.  Petition ¶ 12(D) at 6-A4 - 6-A5.  In opposition, Respondent argues that this claim is entirely speculative which cannot support a finding of prejudice under *Strickland*.  Respondent's Memorandum at 42-43.

Workman, a private investigator, testified at trial as an accident reconstruction expert on behalf of the defense.  (Tr. at 1410-14).  Whether any juror knew or was biased against Workman for any reason is not established by the record.  As such, Petitioner's assertion that the failure to include Workman on the defense witness list presented to the venirepersons rendered Joch's trial representation ineffective is based on mere speculation, which is insufficient to meet *Strickland*'s two-part test for inefficient assistance of trial counsel.  *See Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (asserting that federal courts should not grant "habeas relief on the basis of little more than speculation with slight support.").  This aspect of Petitioner's claim for ineffective assistance of trial counsel is therefore without merit and was properly rejected by the state courts.

Accordingly, the Petition should be DISMISSED insofar as it asserts a denial of effective assistance of trial counsel.

## CONCLUSION

Based on the foregoing, the court finds none of Petitioner's grounds for relief have any merit and, accordingly, the Petition should be DISMISSED.

Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue.  28 U.S.C. § 2253, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      July 23, 2008
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:      July 23, 2008
            Buffalo, New York